IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| PATRICIA A. TRAVERS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.3:12-cv-617 |
| | ) | |
| vs. | ) | Judge  Campbell |
| | ) | Magistrate Judge Bryant |
| | ) | |
| | ) | JURY DEMAND |
| CELLCO PARTNERSHIP | ) | |
| d/b/a/ VERIZON WIRELESS | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant brings the instant motion after refusing to provide relevant comparator and discipline information and its progressive discipline policy. For that reason alone adverse inferences can be drawn and the motion denied; alternatively, the motion should be denied pursuant to Rule 56(d) due to Defendant's failure to provide relevant discovery. Notwithstanding the blatant discovery failures, the evidence currently available demonstrates that Defendant's reason for Ms. Travers' termination was retaliation for taking FMLA and pretext for unlawful discrimination under the ADA.[1]

From Spring 2009 through Spring 2010 Plaintiff, Ms. Travers, began suffering from serious health problems. Twice she was taken from work by ambulance due to her health problems. However, at no time did Defendant, who has no ADA accommodation policy, address her health conditions except to write her up for taking too much sick leave. Further, it failed to

properly notify her of her rights under the FMLA. Indeed, Ms. Travers did not even know that she could file for intermittent FMLA for her migraines until her physician suggested she look into it in the fall of 2010 to protect her job. After Ms. Travers's health conditions intensified in the fall of 2009, so did the scrutiny of her job performance.

Only by ignoring what appears to be its progressive discipline policy (based solely on managers' testimony since Defendant has refused to produce it), did Defendant rapidly escalate discipline against Ms. Travers to justify her termination. The alleged performance issues cited by Defendant did not harm a customer, to the contrary, actions she allegedly took benefitted the customer and there were no customer complaints about Ms. Travers' job performance, indeed, Defendant acknowledges that she was complimented by the customer for her job performance for the events which allegedly gave rise to her termination. However, none of the notes concerning her discipline or other evidence of the calls that allegedly gave rise to her discipline and termination were produced or appear to exist at this time, with exception of a few e-mails Defendant cherry picked. Moreover, Defendant's managers admit that Ms. Travers' actions neither benefitted her sales numbers, nor did she intentionally commit a policy infraction. Defendant is also unable to produce a single relevant policy or procedure statement concerning rebates that demonstrate Plaintiff in fact violated such. Thus, Defendant argues their current managers' word should be sufficient, despite Plaintiff's recollection to the contrary. Further, Defendant's manager Gowler admits that the discussion concerning Plaintiff's termination was held in tandem with a discussion concerning Ms. Travers' absences, FMLA and placement on Defendant's "disability dashboard" where Defendant tracks employees who are on FMLA or short term disability. After months of Ms. Travers' placement on Defendant's "disability

---

[1] Plaintiff informed Defendant that she is voluntarily dismissing Count III, her TPPA, common law wrongful

Case 3:12-cv-00617   Document 34   Filed 06/25/13   Page 2 of 27 PageID #: 948

dashboard" Defendant terminated Ms. Travers on her first day back from approximately a month of FMLA she took related to diagnosis and treatment of her heart condition which eventually required placement of an internal defibrillator.

In urging complete dismissal of Plaintiff's claims, Defendant's Motion for Summary Judgment (ECF No. 20) ("MSJ") and its accompanying Memorandum (ECF No. 21) ("Memo") fails to meet its burden that no genuine issue of material fact remains, in part due to Defendant's refusal to provide relevant information. Alternatively, the motion should be denied pursuant to Rule 56(d) due to Defendant's failure to provide relevant discovery and the Plaintiff be allowed to conduct additional discovery depositions after Defendant produces the overdue discovery.

## FACTUAL BACKGROUND

### Ms. Travers' FMLA and ADA Disability

Plaintiff suffered from migraines her whole life and while she worked at Verizon she was on daily medication for migraines. Travers Dep. 32, 154. She suffered from migraines at work before she even knew she could apply for FMLA for them. *Id.*; Travers Decl. ¶4. On Thursday, July 16, 2009, Ms. Travers left work in an ambulance due to a severe migraine. Travers Decl. ¶4. As a result, she also had a physician excuse from work the following day, July 17, 2009. Travers Decl. ¶4. Despite leaving work in an ambulance this incident was not coded as FMLA, nor did she recall her supervisor or HR suggesting that FMLA was appropriate for this event. Travers Decl. ¶4.

Ms. Travers started having heart palpitations and on March 11, 2010, wearing a Holter monitor at work to monitor her heart. Travers Dep. 22-24; Travers Decl. ¶6. As a result of her heart condition, Ms. Travers had a cardiac defibrillator implanted in March 2011. Travers Dep.

---

discharge and ADA retaliation claims due to case law that came out after her Complaint was filed.

29-30. Ms. Travers did inform MetLife, Defendant's agent, who supervisor Pratt was in direct contact with, what her condition was and that working was difficult. Pratt Dep. Ex. 11. Gowler was aware of Ms. Travers' heart condition, she knew Ms. Travers wore a heart monitor at work and she knew that Ms. Travers had migraines and that they called for an ambulance at work for Ms. Travers related to a migraine . Gowler Dep. Vol. I 55; Gowler Dep. Vol. II 124. Ms. Travers left work in an ambulance on June 2, 2010 after passing out from complications related to her heart in her car in the parking lot at work. Travers Dep. 126-127. *See* Miller Dep., Vol. II, 59. Ms. Travers recalled LaJuana Miller, HR manager, called the ambulance. *Id.*[2] Ms. Travers informed her managers about her heart condition, her FMLA in November 2009 and her heart condition in April 2010. Travers Dep. 22-24, 110-111; Trank Dep. 25, 49, 51; Gowler Dep. Vol. I 55; Gowler Dep. Vol. II 124.

Plaintiff took FMLA approved leave on November 8, 10-13, 16-19, 2009; December 3, 8, and 21, 2009; March 1, 2, 10-12, 30-31, 2010; April 1-12, 18, 22-30, 2010; the entire month of May and June 2-18, 2010. Miller Dep. Ex. 1.

**Defendant's Policies that Punish Employees for Being Sick**

Defendant has no ADA accommodation policy for employees. Miller Dep. Vol. II 159. Gowler testified that she did not have anyone from 2009 to present make a specific request that was ADA related, for an accommodation under the ADA or being notified that an employee had made such a request. Gowler Dep. Vol. II 135-136. Employees can be put on disciplinary action just for attendance and using too much sick time. Pratt Dep. 41-42. Sick time is referred to as "UIA" - unscheduled illness absence. Pratt Dep. 40. If a Verizon employee uses up too much sick time in one year, they will be penalized and not given a full allotment of sick time in the following year and

---

[2] During the relevant time period, LaJuana Miller was the HR Manager, Minyarn Pratt was the Performance Supervisor, Denise Gowler was the CMO department manager who supervised Phillip Trank, Ms. Travers'

they will be disciplined for using too much sick time. Trank Dep. 77; Pratt Dep. 41-42. Defendant had a policy of writing employees up who used too much sick time, and if they had used their allotment of sick time in a prior year, their sick time for the following year was prorated because the employee would be on disciplinary action for using too much sick time. Pratt Dep. 40-42; Trank Dep. 30-32. However, each situation is looked at on a case by case basis and there is no hard and fast rule that the employee will be disciplined for using too much UIA time. Pratt Dep. 42. Unless an employee uses a certain amount of sick time, management does not refer employees to FMLA under the belief that how much time an employee needs off work is a qualification for FMLA. Pratt Dep. 37, Trank Dep. 26. Managers at Verizon are always encouraged to look for out of the box solutions relating to attendance management. Miller Dep., Vol. I, 63-64. *See* Pratt 2/23/10 Performance Appraisal (attached to SOF as Ex. 1).

On October 23, 2008 Ms. Travers was written up for taking too much sick time. Miller Dep., Vol. I, 116-118, Ex. 12; Pratt Dep. 55. At the time Ms. Travers requested more information about FMLA so she could avoid that type of written reprimand in the future. *Id.* Travers Decl. ¶3. Ms. Miller could not recall that she ever followed up with Ms. Travers about her request. Miller Dep., Vol. I 118. Ms. Travers also recalls that she was not provided any further information concerning her request. Travers Decl. ¶3. Pratt recalled that when she delivered the "final written warning" to Plaintiff, Plaintiff became upset and Pratt brought her manager, Kimberly Gibson Harris to the meeting. *Id.* 55-56. Ms. Travers was also written up on April 29, 2009 for taking too much sick time. Pratt Dep., Ex. 4.Trank only recalled one other employee who had both an FMLA and short term disability claim and they were also terminated for progressive discipline. Trank Dep. 66.

---

immediate supervisor from November 2009 to her termination, at Verizon Wireless, Franklin where Ms. Travers

**Defendant Places Employees on a "Disability Dashboard" When They Get Sick**

Defendant places employees who take FMLA or short term disability on a "disability dashboard" that lists days an employee is out for that time and what the status is of their claim with MetLife and the dates of leave that is approved. Miller Dep. Vol. II 153; Pratt Dep. 26, 28-29; Trank Dep. 29, 57. Managers and Supervisors have access to the "disability dashboard" and are kept apprised of benefit end date and when they are expected to return. Pratt Dep. 96; Trank Dep. 57, 110. Managers and Supervisors also got email notifications about employees' status on the "disability dashboard." Trank Dep. 57. Managers are regularly updated if employees are coming up on corrective action and are starting to either need coaching if they are close to exceeding 2% absenteeism for sick leave. Gowler Dep., Vol. I, 99. Minyarn Pratt was the primary person in the CMO department that handled FMLA, short term disability and requests for accommodation. Pratt Dep. 43-45. In most cases information about requests for accommodation was brought to Pratt from an employee's supervisor. *Id.* 45. Ms. Pratt reviewed Ms. Travers' performance including attendance once a month with managers, including Gowler. Pratt Dep. 46-47. These meetings were typically five days into the month. *Id.* 47. In these meetings the center's performance as well as individual employees' performance and level of discipline was discussed. *Id.* 48, 51.

**Defendant Does Not Properly Notify Employees of FMLA and Requires Them Engage in a Cumbersome Process To File A "Claim" With MetLife If They Want To Take FMLA**

Verizon uses MetLife, a third-party administrator to handle FMLA and requests for insurance coverage under for short term disability. Miller Dep. 43; Pratt Dep. 26, 31. An employee has to initiate a claim though MetLife for it to be reflected on the Disability Dashboard. Pratt Dep.70. An employee has to make a claim to MetLife for FMLA to be applied. Pratt Dep. 30-31;

---

Worked.

69-70; Miller Dep., Vol. II, 62. Simply telling a manager that they may have an FMLA qualifying event would not give rise to time being taken off classified as FMLA unless the employee subsequently filed for FMLA. Pratt Dep. 30-31, 63-64. Employees complain about MetLife all the time; it is not uncommon for Verizon employees to complain about MetLife. Pratt Dep. 32. If an employee wants to apply for FMLA they are expected to do it on their own time, on breaks or after work. Trank Dep. 81-82.

**Ms. Travers Is Put On the "Disability Dashboard"**

Ms. Travers was put on Defendant's "disability dashboard" in November 2009 when she requested intermittent leave for her migraines. Pratt Dep. Ex. 4; Trank Dep. Ex. 4. The only direct dealings Pratt recalled having with Plaintiff in 2009/2010 were regular meetings about her attendance. Pratt Dep. 54. Verizon's disability dashboard reflected that Ms. Travers' filed for FMLA or short term disability claims November 10, 2009, March 23, 2010, April 6, 19, 26, 27, 2010 and June 2, 3, 2010 with a benefit end date of July 7, 2010. Pratt Dep. 95-96, Ex. 10. Ms. Travers perceived that the process with MetLife was long, ongoing and stressful and that she had to call them on a daily basis to see if it was approved and she was threatened that she was missing too much time and would be disciplined when the claims got confused. Travers Dep. 93, 105, 109-110, 121; Trank Dep. Ex. 2 at 807.

On January 26, 2010 Trank coached Ms. Travers that she did not have any UIA until January 31, 2010, when she was off final warning for taking too much sick time. Trank Dep. 77, Ex. 2 at 807. He also reviewed her FMLA time with her because sick time she had taken off was not being covered by her existing FMLA claim with MetLife. *Id.* Subsequently, on January 28, 2010, Ms. Travers' manager Phillip Trank commented on her 2009 evaluation that she needed to

"focus on managing her time off in 2010" and "keeping her absenteeism rate to the 2% goal." Trank Dep. 117-119, Ex.5 at 119.

On March 22, 2010 Ms. Travers told Trank that she was being referred to a specialist that could not be rescheduled and she was advised by Trank that she would need to contact MetLife about a starting a new claim and that seeing a specialist would probably not be covered under existing FMLA claim. Trank Dep. 101-102, Ex. 3 at 803. On April 19, 2010, Trank advised Ms. Travers that her claims for FMLA for absences for March 25 and 26, 2010 were denied and without FMLA the absences would move her to a verbal warning. Trank Dep. 105-106, Ex. 3 at 801.

**Defendant's Progressive Discipline Policy (As Understood Through Testimony Since Defendant Has Refused To Produce The Actual Policy)**

Defendant has a progressive discipline policy. Pratt Dep. 17. Defendant has not produced its progressive discipline policy. Miller Dep. Vol. II 180, Ex. 29 at 7, ¶6. *See* ECF No. 18, 26, Plaintiff's Motion to Compel and Reply.  For a Code of Business Conduct ("COBC") violation, the violations are not merged. Pratt Dep. 20. For example, an employee could have three COBC violations for different things, e.g. ACD abuse or integrity, and those would be considered separate instances and a verbal for one would not move to a written for another type of COBC violation. *Id.* 20-21. After the employee is on progressive discipline for a particular time frame for a COBC violation and the time frame for the violation expires, it means that the employee is "free and clear" and they can continue to progress in their career. *Id.* 22. After completion of the performance management process the employee restarts the performance management process from the beginning. Trank Dep. 33-34. Trank provided information about termination review to upper management, including Gowler, Miller and Spears, who decided whether to progress to termination review; termination review was not automatic after a final written warning. Trank Dep. 20.

**Background on Defendant's Policies and Procedures Implicated in Ms. Travers' Discipline**

All employees were coached by their supervisor at least two to three times a month to help them become better employees. Gowler Dep., Vol. I., 59. Scripting was provided to representatives for legal disclosures and there was a quality checklist. Trank Dep. 35. *See* Gowler Dep., Vol II, 186-188. Outbound calls were more scripted, inbound calls go through an "IVR" system that includes a series of prompts and the customer gets notifications played to them before getting to a representative. Trank Dep. 36-37. Customers who call in get terms and conditions in writing, disclosed by the representative and duplicated again by transferring them to an IVR system where the customer would hear a recording of the terms and conditions again they would have to accept. Trank Dep. 39-40. Quality scores given by supervisors are based on criteria, but are not black and white in all areas. Trank Dep. 42-43. At the time Ms. Travers was employed, calls were audited by a compliance team only looking at screen shots. Gowler Dep, Vol. I, 19-20. Audits are done to make sure correct codes are used, the notes on the account are correct and that credits are properly done. *Id*. 18. Calls were not recorded 2012. *Id*. 19. If the audits of the screen shots demonstrated that the employee was not compliant, the audit would go back to the supervisor for coaching. *Id*. 18. Supervisors and managers could also listen to calls during a call to observe representatives. *Id*. 21-22. The auditor was supposed to submit a DRC audit sheet to a supervisor, the supervisor should coach the employee on the issue within one week of receiving the audit sheet and the audit sheet is to be signed by the employee and sent back to audit. Gowler Dep, Vol. I, 27-28, Ex. 14. Separate from audits are "quality" scores. Gowler Dep., Vol. I, 18-20.The quality team just listened to calls to make sure the call went on in a timely manner and that they were polite. *Id*. 20. Prior to 2012, the supervisors did not have a practice of going back and listening to calls, they just looked at the notes. Gowler Dep., Vol. I, 21.  Offering a free month of service was a promotion in March 2010 that was

to be used to assist with a sale. Trank Dep. 145-146. Verizon's policy at the time that Ms. Travers was employed stated that a representative who offers a discount must get approval from a supervisor or lead. Gowler Dep. Vol . I 16-17, Ex. 12. The representative cannot complete the transaction until the supervisor approves the transaction. *Id.* 17. However, Verizon would run regular promotional campaigns that would offer discounts to a customer based on the campaign offer and that discount would be automatically entered when the representative entered the order. *Id.*17, 44-45. Prior to 2011 representatives could offer and apply an instant rebate reactively and the supervisor could approve it verbally. Gowler Dep. Vol . I 40-42, Ex. 8. However this policy was not set forth in a written policy. *Id.* 43. There was no way to prove if an offer was offered proactively or reactively other than listening to the call. *Id.* 46.

**Events Leading Up Ms. Traver's Termination**

### *September 4, 2009 Written Warning- COBC/Integrity*

Trank testified that he did not write up employees he was not supervising. Trank Dep. 58-59. Further, he did not do one on one counselings when he was filling in for another supervisor. Trank Dep. 88. Nonetheless, Trank was involved in a Written Warning in September 2009 for a COBC violation for "Integrity" concerning Ms. Travers, although he contends he did not write her up, he just handled delivery. Trank Dep. 92-93, Ex. 7. Travers Dep. 129-131.  Trank was not Plaintiff's manager when he "handled delivery" and this write up includes a counseling from July 8, 2009 and August 28. Trank Dep. 8, Ex. 7. There is no mention in Trank's notes from August 31, 2009 that the August 28, 2009 was being reviewed for a COBC violation. Trank Dep., Ex. 1 at 839. Plaintiff's September 4, 2009 COBC violation was completed on March 4, 2010. Pratt Dep. 84, Ex. 8.

### *March 19, 2010 Final Written Warning –COBC/General Behavior*

Ms. Travers was written up for a "Final Written Warning" on March 17, 2010 (signed March 19, 2010) for alleged problems with calls that took place on March 9 and 17, 2010. Trank Dep. Ex. 8. However, Ms. Travers does not recall receiving or discussing this write up. Travers Dep. 171-172. Trank's coaching notes with Ms. Travers from March 18, 2010 do not reflect that she was coached on a problem with a call on March 17, 2010, that was one of the alleged bases for her March 17, 2010 write up. Trank Dep. 166; Ex. 8. To the contrary, Trank's March 18, 2010, notes reflect that Ms. Travers was "at or above goal in every category MTD [month to date], phenomenal job in closes and data sales. **100% accuracy in audits MTD**." Trank Dep. Ex. 3 at 804 (emphasis added). There is no mention of a coaching concerning a write up on March 17, 2010 or any other problem "month to date." Trank Dep. 167-168, Ex. 3. However, Trank testified that if he provided counseling that led to discipline it would be included in his database notes. Trank Dep. 16. Further, it was rare for Trank to recommend manager review for a call of an employee he supervised outside of his own coaching of that employee. Trank Dep. 64, 70.

On the March 9 call, Ms. Travers told the customer that she was checking to see if she could waive the rebate. Gowler Dep., Vol. I, 78, Ex. 10 at 891. The waiver of the rebate was something that was allowed by defendant's system. *Id.* 80. Gowler did not talk to Ms. Travers to determine whether she had gotten approval from Trank, but she did note that another supervisor approved it. *Id.* 80. The March 17, 2010 Final Written Warning states that Ms. Travers typed it was an online price match out of habit when she submitted the request to the supervisor and that she did not intend to misrepresent the order. Gowler Dep., Vol. I, 84-85, Ex. 27. If the sale were waiver of an instant rebate it would not have required supervisor approval and an online price match only required verbal approval; however, because Ms. Travers still sent the order to a supervisor and it was approved. *Id.* 85. Gowler acknowledged it was just a mistake. *Id.* The alleged problem with the

11

March 17 call, offering an additional month service, did not strengthen Ms. Travers' sales number because she had already secured the sale and the customer had already agreed to a new two year contract. Trank Dep. 147-148. Moreover, Trank admitted that Ms. Travers would have gotten the sale regardless of whether the customer received the free month promotional offer. *Id.* When Trank and Gowler were in discussions about Ms. Travers' March 17, 2010, Final Written Warning, Ms. Travers was on FMLA. Gowler Dep., Vol I, 77; Vol.II, 191.

### *April 21, 2013 Call that Allegedly Triggered Termination*

Trank's notes reflect that on April 22, 2010 he listened to the call concerning an alleged customer complaint and improper waiver of mail in rebates. Trank Dep. Ex.3 at 800. The next and last note from June 1, 2010 states that he coached Mr. Travers per his previous note [April 22, 2010], advised her to make sure full account analysis was done, coached on proper AoI procedure and that she should not escalate without permission. Ex. 3 at 799. Nothing in Trank's notes reflect that these issues were being reviewed for discipline or termination. Trank Dep. 108, Ex. 3 at 800. Trank sent an email to Gowler on April 23, 2010 noting that he had issues with Ms. Travers that required *coaching* on her return, including a call on April 21, 2010. Gowler Dep., Vol. I, Ex. 9 at 00894. Trank did not recommend Ms. Travers for termination review. Trank Dep. 21, 69. Gowler did not submit the April 21, 2010 call for "review for Term data" until June 1, 2010. *Id.* Ex. 9 at 893. The April 21, 2010, call was the triggering event for Ms. Travers' termination. Gowler Dep., Vol. I, 76. Travers denied proactively offering to waive a mail in rebate and Ms. Travers thought she asked Trank about the order. *Id.* 68-69, 70-71, Ex. 9 at 00894. In reviewing the call with Ms. Travers, Gowler and Trank only had the screen shots of the call. *Id.* 69. The Defendants do not have the screen shots to verify what occurred. *Id.* Defendant does not have a written policy or a copy of the campaign concerning the April 21, 2010 call where the customer was saved money by

12

application of the instant rebate that gave rise to Ms. Travers termination. Gowler Dep., Vol. I, 71-72; Gowler Dep., Vol. II, 189-190. Gowler does not recall if she went back and looked to see if a campaign was being offered that would have applied. *Id.* Nonetheless, Gowler admits that regardless of Plaintiff's actions, the customer would have gotten the money either way, mail in or instant, that she just saved the customer the process of actually mailing it in. *Id.* 67.

It depends on what campaigns were going on as to whether or not an employee could quickly get up to speed if they had been out of work for a month. Gowler Dep., Vol. I, 73. When the issue came up concerning the April 21, 2013 call Ms. Travers had been out most of April and last five days of March. Gowler Dep., Vol. I, 73; *see* Ex. 1. The decision to terminate Ms. Travers was made when she was on FMLA. Gowler Dep., Vol. I, 95-96. Gowler recommended that Ms. Travers be reviewed for termination. Gowler Dep., Vol. I, 91. Miller also recommended Travers' termination. Miller Dep., Vol. I, 126-127. The final decision to terminate was made in a management meeting with Spears, Miller, Gowler, Gibson-Harris and Pratt at that same time they "were looking at" any attendance related issues and FMLA. Gowler Dep., Vol II, 121-122, 125. Miller Dep., Vol I, 108, 119-123, 125-127. Gibson-Harris was aware generally of the alleged job performance and attendance issues that had been raised regarding Ms. Travers. Gowler Dep., Vol II, 122. Gibson-Harris was Pratt's manager who reviews Pratt. *Id.* 127. The information request for termination concerning Ms. Travers was drafted by Pratt, but the information for it was given to her from the manager or supervisor, who she relied on to say what occurred actually did occur. Pratt Dep. 80-81, Ex. 7. However, Pratt just did not recall who gave her what information or who requested the notice. Pratt Dep. 80-81. Plaintiff's request for termination notice drafted by Pratt lists three separate COBC allegations: 1 for behavior (10/2/08); 1 for ACD abuse (6/4/09) and 2 for Integrity (9/4/09, 3/19/10); as well as her attendance history. Pratt Dep. 79, Ex. 7 at 00011.

However, the March 19, 2010, write up actually states that it is for "general behavior." Trank Dep., Ex. 8.

### *Termination Meeting*

Pratt and Gibson-Harris were present during Ms. Travers's termination meeting on June 21, 2010, but Pratt recalls nothing about the meeting. Pratt Dep. 74; Travers Dep. 20-21. Gibson-Harris stated to Ms. Travers in her termination meeting that "you've missed a lot of work and we need you here." Travers Dep. 21, 178. Because Pratt has no recollection of Plaintiff's termination meeting, she has no reason to dispute Ms. Travers' recollection that Gibson-Harris stated to Plaintiff that she [Ms. Travers] had missed a lot of work and they [Verizon] needed her to be there. Pratt Dep. 74-77. Failure to provide consumer disclosures were not a basis for Ms. Travers' termination. Gowler Dep., Vol. II, 188-189.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The court's function is not to determine the truth of the matters asserted, but whether there is a genuine issue for trial. *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000). Summary judgment should not be imposed to deny a party an opportunity to present a meritorious claim or defense on his/her "day in court." *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979).

Pursuant to Federal Rule Civil Procedure 56(d) for specified reasons, in the event a party cannot present facts essential to justify its opposition, the court may: "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." This Rule "recognizes that there are instances when a party lacks the necessary facts to properly contest a summary judgment motion." *CareToLive v. FDA*, 631 F.3d 336, 345 (6th Cir. 2011). *See Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) ("When *Rule 56[d]* functions properly, it ensures that, in the mine-run of cases, a litigant who fails to answer potentially relevant discovery requests on schedule will be unable to demand summary judgment until after he remedies his failure.") (internal citation omitted).

### III. ARGUMENT

#### A. There are Disputed Issues of Fact Concerning Plaintiff's FMLA claims

The FMLA entitles an eligible employee to as many as twelve weeks of leave during any twelve-month period when the employee suffers from "a serious health condition." 29 U.S.C. § 2612(a)(1)(C) and (D). Employers cannot use an employee's use of FMLA as a "negative factor" in employment actions. 29 C.F.R. § 825.220(c); *Hunter v. Valley View Local Schools*, 579 F.3d 688, 691-92 (6th Cir. 2009). "The phrase 'a negative factor' envisions that the challenged employment decision might also rest on other, permissible factors." *Id.* at 692. "[The Sixth Circuit] recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Plaintiff has alleged causes of actions under both theories.

#### A. A. Retaliation

The facts demonstrate that Plaintiff was retaliated against for taking FMLA. Employers

cannot use an employee's use of FMLA as a "negative factor" in employment actions. 29 C.F.R. § 825.220(c); *Hunter v. Valley View Local Schools*, 579 F.3d 688, 691-92 (6th Cir. 2009). "The phrase 'a negative factor' envisions that the challenged employment decision might also rest on other, permissible factors." *Id.* at 692. To establish an FMLA discrimination claim, a plaintiff must demonstrate that: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Killian v. Yorozu Automotive Tennessee, Inc.,* 454 F.3d 549, 556 (6th Cir. 2006). Temporal proximity to protected conduct and an adverse employment action can establish causation. *Bryson v. Regis Corp.,* 498 F.3d 561, 571 (6th Cir. 2007).

If there is indirect evidence, courts apply the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), to analyze whether the employer took the adverse action because of an illegal reason or for a legitimate nondiscriminatory reason. *Edgar v. JAC Products, Inc.,* 443 F.3d 501, 508 (6th Cir. 2006). The burden-shifting framework established from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), applies to FMLA retaliation claims. *Edgar,* 443 F.3d at 508; *Skrjanc,* 272 F.3d at 315. Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. 411 U.S. at 802. A plaintiff can make out a *prima facie* case by showing: (1) "she availed herself a protected right under the FMLA . . . , (2) she suffered an adverse employment action, and (3) there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Edgar,* 443 F.3d at 508. "[P]laintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Bryson v. Regis*

*Corp.,* 498 F.3d 561, 570 (6th Cir. 2007). If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the dismissal. *Id.* If the defendant articulates such a reason, the plaintiff then bears the burden of demonstrating that the given reason is pretext for discrimination. *McDonnell Douglas, 411 U.S. at 804-06.* "A plaintiff can demonstrate prextext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).* However, where there is direct evidence that the decision-maker acted with a retaliatory motive, the burden-shifting framework is unnecessary. *Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 707 (6th Cir. 2008). Derogatory remarks about an employee's attendance constitutes direct evidence of retaliation. *Allen v. STHS Heart, LLC*, 2010 U.S. Dist LEXIS 51180 at *36 (M.D. Tenn. May 21, 2010). If the plaintiff produces direct evidence of improper motive, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision to discharge the employee absent the impermissible motivation. *Daugherty,* 544 F.3d 709. In this case Plaintiff continued to be written up and on performance management for her sick leave. *See* Trank Ex. 2 at 807. Further, Gibson –Harris' comments during Plaintiff's termination are likewise persuasive. Thus, there is direct evidence of retaliation.

Even if the court analyzes the case based on indirect evidence there are still disputed facts. Plaintiff easily meets her prima facie burden. Without a doubt, she engaged in protected conduct no later than in November 2009 and again in March 2010 when she formally filed for FMLA and as demonstrated by her discussion with Trank January 28, 2010. Miller Dep. Ex. 7; Trank Dep. Ex. 2 at 807. Moreover, her notifications to her supervisors of serious health conditions, including being transported from work in an ambulance in July 2009 and again June

2010, were likewise sufficient to put them on notice that the Defendant's duties under the FMLA were triggered. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). Ms. Travers suffered adverse employment actions on with each write up and was terminated. Causation is demonstrated by the temporal proximity between her protected conduct and discipline and eventual termination. *Bryson v. Regis Corp.,* 498 F.3d at 571.

Defendant's alleged legitimate reasons for termination, violations of the COBC, are clearly pretext because they are undermined on numerous fronts.

- First, Gowler admitted that with regards to the write up for termination that either way the customer would have gotten a rebate. Gowler Dep., Vol. II, 67.

- Second, according to Pratt, the Defendant's progressive discipline policy was not violated because each infraction for different violations was escalated rather than being separate. Pratt Dep. 20-21. *Durante v. Ohio Civil Rights Comm'n*, 902 F.2d 1568 (6th Cir. 1990)(failure to follow internal progressive discipline is evidence relevant to the ultimate question of discriminatory discharge). Moreover, the court can draw an adverse inference since Defendant refused to produce its policy. *Clay v. UPS,* 501 F.3d 695, 712 (6th Cir. 2007).

- Third, Defendant has been unable to produce a single relevant policy or procedure that demonstrates there was in fact a procedure in place that was violated. Gowler Dep., Vol. I, 71-72; Gowler Dep., Vol. II, 189-190.

- Fourth, Plaintiff denied she proactively offered an instant rebate. Gowler Dep., Vol. I, 68-69, Ex. 9 at 00894. *Harris v. JB Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) (Testimony alone can be sufficient to create a jury question regarding an issue of material fact).

18

- Fifth, Trank acknowledged with regards to the March write up that Ms. Travers would have gotten the sale anyway, so there was no incentive on her part to make an additional offer. Trank Dep. 147-148.

- Sixth, with regards to the March 9 allegation, Gowler admitted that it was just a mistake. Gowler Dep., Vol. I, 84-85.

- Seventh, several of the write ups took place while Plaintiff was on FMLA and the discussion concerning Ms. Travers termination took place in the same meeting where management were also discussing her attendance issues. Gowler Dep., Vol II, 122.

- Lastly, during Ms. Travers termination meeting Gibson-Harris, who was also present in the management meetings, stated to Ms. Travers in her termination meeting that "you've missed a lot of work and we need you here." Travers Dep. 21, 178. Gowler Dep., Vol II, 122-125.

Thus, multiple facts remain in dispute and Defendant's motion should be denied. Only a jury can determine if these absences were a "negative factor" in the write-ups and eventual termination of Plaintiff. 29 C.F.R. § 825.220(c).

**Interference**

The interference theory creates prescriptive rights under 29 U.S.C. § 2615(a)(1). To prevail on a claim, "the plaintiff need not show that she was treated worse than other employees, just that she was denied an entitlement under the Act. An employer may violate the FMLA regardless of the intent behind its conduct." *Hoge*, 384 F.3d at 244. The elements of an FMLA interference claim are (1) plaintiff was an eligible employee, (2) defendant is a covered employer, (3) plaintiff was entitled to leave under the FMLA, (4) plaintiff gave defendant notice of her intent to take leave, and (5) defendant denied her FMLA benefits or interfered with FMLA rights

to which she was entitled. *Id.* If an employer proves a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee, the plaintiff must "rebut the employer's reason by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Donald v. Sybra, Inc.,* 667 F.3d 757, 762 (6th Cir. 2012).

According to 29 C.F.R. 825.300(b)(1), when an employee either requests FMLA leave or when the employer acquires knowledge that an employee's leave may be for a FMLA-qualifying reason, the employer must notify the employee of their eligibility to take FMLA leave within five business days, absent extenuating circumstances. Notice may be either oral or in writing. 29 C.F.R. 825.300(b)(2). At the same time that notice of eligibility is given, the employer is also required to provide written notice to the employee detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations. 29 C.F.R. 825.300(c)(1). The written notice must include that (a) leave will be counted against the employee's annual FMLA leave entitlement, (b) any requirements for the employee to provide a medical certification of a serious health condition and the consequences for failing to do so, among others. 29 C.F.R.. 825.301(b)(1). Pursuant to 29 C.F.R. §825.700, "[a]n employer must observe any employment benefit program or plan that provides greater family or medical leave rights to employees than the rights established by the FMLA." Moreover, "[o]n return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment." 29 C.F.R. §825.214.

An employee need not specifically say, "I need FMLA leave" in order to trigger an employer's duty of inquiry. Under the FMLA, "an employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in

need of FMLA leave." *Spangler v. Federal Home Loan Bank of Des Moines*, 278 F.3d 847, 852

(8th Cir. 2002)( whether an employee provided proper notice is a question of fact). "An employee

need not invoke the FMLA by name in order to put an employer on notice that the Act may have

relevance to the employee's absence from work." *Id.* This was further clarified in *Hammon v.*

*DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) where the Court reasoned:

> An employee does not have to expressly assert his right to
> take leave as a right under the FMLA. *See Manuel v.*
> *Westlake Polymers Corp.*, 66 F.3d 758, 761 (5th Cir.
> 1995)(citing *Brannon v. OshKosh B'Gosh, Inc.*, 897 F.Supp.
> 1028, 1038 (M.D. Tenn. 1995). Once an employer is given
> notice that an employee is requesting leave for a FMLA-
> qualifying reason, the employer bears the obligation to
> collect any additional information necessary to make the
> leave comply with the requirements of the FMLA.

Additionally, and consistent with 29 C.F.R. § 825.220(c), "employers cannot use the

taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or

disciplinary actions . . . ." To the contrary, it is unlawful under the FMLA for the employer "in whole

or in part" to take any negative employment action against an employee due to the employee's use or

attempted use of FMLA-protected leave. *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir.

2007); *see also Welty v. Honda of Am. Mfg., Inc.*, 411 F.Supp.2d 824, 828 (S.D. Ohio

2005)(finding it unlawful for the employer to use the Plaintiff's FMLA leave as a "negative

factor" in its decision). Under the interference theory, when "an employer interferes with the FMLA-

created right to medical leave . . . a violation has occurred." *Arban v. West Publishing Corp.*, 345 F.3d

390, 401-02 (6th Cir. 2003). Like a discrimination claim, the timing and pretextual reason for an

employer's decision to terminate an employee can give rise to a question of fact in an FMLA case. *Id.*

It is undisputed that Defendant did not meet its FMLA obligation here. Plaintiff testified

that even though she notified her managers of her health conditions on several occasions,

including being transported from work by ambulance, she neither received the required notification, nor was she advised of her rights under the FMLA until her physician suggested she apply for FMLA. Travers Decl. ¶4, 6. To the contrary, defendant did not provide employees MetLife information unless multiple days were missed and then they placed the burden on Plaintiff to file a cumbersome claim with MetLife and it would not allow her to do this while at work unless she was perhaps on break. Pratt Dep. 30-31; 69-70; Miller Dep., Vol. II, 62; Trank Dep. 81-82. Further, for the same reasons addressed *infra*, Defendant's reasoning is pretext. Thus, disputed factual issues preclude summary judgment on Plaintiff's FMLA interference claim.

**B.   Defendant Has Failed to Meet Its Burden that It Is Entitled To Summary  Judgment on Plaintiff's ADA Claims**

Under the ADA "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "disability" means, (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1)(A)-(C). An individual may establish a disability under any one or more of these prongs.  29 CFR 1630.2(g)(2).  The definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."  42 U.S.C. § 12102(4)(A). Additionally, in amending the ADA, Congress stated: "If an individual establishes that he or she was subjected to an action prohibited by the ADA because of actual or perceived impairment -- whether the person actually has the impairment or whether the impairment constitutes a disability -- then the individual will qualify for protection

under the Act." 154 Cong. Rec. at S8842. *See also* 29 C.F.R. §1630.2(j)(1)(iii) (the primary object in cases brought under the ADA should be whether employers have complied with their obligations and whether discrimination occurred, not whether an impairment limits a major life activity which should not demand extensive analysis). To prove a case of discrimination under the ADA an plaintiff must prove: "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tenn. Analytics, Inc.,* 639 F.3d 253, 258-9 (6th Cir. 2011).

The term "'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Providing additional unpaid leave can qualify as a reasonable accommodation. *Cehrs v. NE Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 783 (6th Cir. 1998). The ADA requires the employee and employer to interact in good faith to determine the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C. F. R. § 1630.2(o)(3); *Lafata v. Church of Christ Home for the Aged,* 325 F. App'x 416, 422 (6th Cir. 2009). S*ee also Kleiber v. Honda of Am. Mfg., Inc.,*485 F.3d 862, 871 (6th Cir. 2007) ("the interactive process is mandatory, and both parties have a duty to participate in good faith."). Failure to engage in the interactive process can result in liability under the ADA if reasonable accommodations would have been possible. *Burress v. City of Franklin,* 2011 U.S. Dist. LEXIS 92668 *41 (M.D. Tenn. August 17, 2011) (ECF No. 37-1) (citing *Lafata,* 325 F. App'x at 422). Moreover, an employee is not required to use the "magic words" accommodation or disability to trigger the required

interactive process, asking for continued employment can be sufficient. *Burress,* 2011 U.S. Dist. LEXIS 92668 *41-42.

Essential functions are "fundamental job duties of the employment position ... not including] the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be essential where: (1 ) "the reason the position exists is to perform that function," (2) there are a "limited number of employees available among whom the performance of that job function can be distributed," (3) "[t]he function [is] highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function," or (4) for other reasons. 29 C.F.R. § 1630.2(n)(2)(i)-(iii). Essential functions are the critical job duties, while marginal functions are those tasks or assignments that are tangential.

A physical impairment is "any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. §1630.2(h)(1)(2011). The term substantially limits means "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §1630.2(j)(1)(i)-(ii). Major Life Activities mean "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(i).

To prove a "regarded as" claim under the ADA, as amended, plaintiff must show she was "subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A) (2009). An impairment that is minor or transitory, having an actual or expected duration of six months or less, does not satisfy the "regarded as" prong. 42 U.S.C. § 12102(3)(B).

To recover on a claim of discrimination under the ADA a plaintiff must show that she: 1) suffers from a disability as defined by the ADA; 2) is otherwise qualified to perform the requirements of her position, with or without reasonable accommodation; and 3) was discriminated against solely because of her disability. *Macy v. Hopkins County School Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007). A plaintiff can establish unlawful discrimination by introducing direct or indirect evidence of discrimination. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996). A Plaintiff only needs to prove one or the other, not both. *Burress,* 2011 U.S. Dist. LEXIS 92668 *35.

Ms. Travers can satisfy the prima facie case. First, Ms. Travers must show that she is disabled as defined by the ADA. *Monette,* 90 F.3d at 1186. In the instant case there is ample evidence that Defendant regarded Plaintiff as disabled and that she was disabled as defined by the ADA because she had a physical impairment affecting her neurological and cardiovascular systems. Moreover, Defendant regarded Ms. Travers as Disabled. Simply because Ms. Travers applied for FMLA, she was placed in Defendant's "disability dashboard." Any argument that Defendant did not regard her as "disabled" when it defined her as such defies logic. Accordingly, because Defendant regarded Ms. Travers as disabled, this prong of the analysis is satisfied. Further there is evidence that Plaintiff had a Physical Impairment. In addition to the evidence that

Defendant regarded Plaintiff as disabled, the facts indicate that she did suffer from a physical impairment that demonstrates she was "disabled" under the ADA. In particular, Ms. Travers had a physical condition which affected one or more body systems, including the neurological and cardiovascular systems and skin. 29 C.F.R. §1630.2(h)(1). As such, she was, at minimum, significantly restricted in the activity of working and performing manual tasks. 29 C.F.R. §1630.2(i). *See also* Pratt Ex. 11.

Second, Plaintiff was qualified to perform the requirements of her position. To meet the second prong of the analysis, the facts demonstrate that Ms. Travers was otherwise qualified to perform the requirements of her position because she did so, quite well as demonstrated by her performance reviews. Travers Dep. Ex 18.

Third, she suffered an adverse employment decision; she was disciplined and terminated.

Fourth, Defendant knew or had reason to know of the Plaintiff's disability. Defendant's managers knew of her health conditions, as evinced by her placement on the "disability dashboard" and the absences that were caused by her health conditions.

Fifth, the position remained open while the Defendant sought other applicants or the disabled individual was replaced. Defendant refused to identify who replaced her, thus an adverse inference can be drawn that she was replaced. Def's Response to Plaintiff's First Interrogatories (ECF No. 18, Ex.2 at 5 ¶7). Further, for the same reasons set forth above in the FMLA analysis, Defendant's reason for Plaintiff's termination was pretextual. Thus, Defendant's motion is to be denied as to Plaintiff's claim that she was terminated because her disability.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court DENY Defendant's motion for summary judgment. Alternatively, the motion should be denied pursuant

to Rule 56(d) due to Defendant's failure to provide relevant discovery and the Plaintiff be allowed to conduct additional discovery depositions after Defendant produces the overdue discovery.

Respectfully submitted,
**COLLINS LAW FIRM**
*/s Heather Moore Collins*
Heather Moore Collins, BPR # 026099
2002 Richard Jones Rd., Suite 200-B
Nashville, Tennessee 37215
615-724-1996
615-691-7019 (fax)
heather@hmcollinslaw.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of June 2013, a copy of the foregoing has been furnished by using the CM/ECF system and notice of such electronic filing will be electronically mailed to Attorneys for Defendant, Andrew S. Naylor, Bahar Azhdari, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, andy.naylor@wallerlaw.com; bahar.azhdari@wallerlaw.com.

*s/ Heather M. Collins*
Heather Moore Collins